IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


LIVE THE LIFE MINISTRIES, INC.,

        Plaintiff and
        Counter Defendant,

vs.                                        Case No. 4:11cv194-WS/WCS

THE PAIRS FOUNDATION, INC.,
and PAIRS, LTD.,

        Defendants and
        Counter Plaintiffs.

_____/


## REPORT AND RECOMMENDATION

      Defendants, Counter Plaintiffs, have moved for a preliminary injunction.  Doc. 17.

Plaintiff responded.  Doc. 22.  With leave of court, doc. 25, Defendants filed a reply.

Doc. 30.  The motion has been referred to me for hearing and a report and

recommendation.  Doc. 34.  A hearing was held on September 19, 2011.  References to

numbered exhibits are to those introduced into evidence at the hearing, unless

otherwise indicated.

      Both parties are non-profit corporations providing marriage and relationship

counseling.  PAIRS, which is comprised of two non-profit corporations, is by far the

largest organization.  PAIRS stands for Practical Application of Intimate Relationship

Skills.  It was started by Lori Gordon, Ph.D., and has been continued by her son, Seth

Eisenberg, and does training nationally and internationally.  Live the Life Ministries, Inc.,

is based in Tallahassee is primarily in the business of helping churches provide

counseling for couples in Tallahassee and elsewhere in Florida.

**Defendants' motion for a preliminary injunction, doc. 17**

At the outset of the hearing, Defendants withdrew their request for a preliminary

injunction with respect to the Capacity Building Training and Services Agreement

(CBTSA) and its restrictive covenant (non-competition clause).[1]

Remaining for resolution are the four copyright claims.  The copyright claims are

premised upon alleged copyright infringement of the 2008 version of "PAIRS

Essentials," a PAIRS publication that condensed a number of earlier PAIRS teaching

concepts into a simpler process for training individuals who are not professionals.

Plaintiff has a program it calls "Start Smart," a program aimed at couples who are

not yet married.  Defendants contend that Plaintiff's Start Smart materials infringe two

aspects of Defendants' copyright in PAIRS Essentials:  the "Daily Temperature

Reading" graphic and the "PAIRS Talking Tips" graphic.  Doc. 12, p. 9, ¶ 32, and p. 10

(graphics).  Plaintiff's version of the first graphic is also entitled the "Daily Temperature

Reading, and Plaintiff's version of the second graphic is entitled "Dialogue Guide."  *Id.*

---

[1] This is an agreement entered into between Defendants and Plaintiff on
November 30, 2006.  Doc. 12, ¶ 20 and Ex. C.  The License Agreement, which is a part
of this contract, contains a non-competition clause.  *Id.*, ¶ 23, citing § IV, ¶ 1, of the
License Agreement.  The License Agreement was renewed on November 18, 2009.
Doc. 12, ¶ 35 and Ex. G, again citing § IV.

The second two claims involve Plaintiff's program "Adventures in Marriage," which is designed for married couples.  At issue is Plaintiff's use of three graphic designs from PAIRS Essentials, "The Emotional Jug," "Levels of Learning," and the "Daily Temperature Reading."  Doc. 12, pp. 13-14, ¶ 45 (including graphics).

**Plaintiff's objection to consideration of exhibits 14 and 30**

Exhibit 14 in evidence at the hearing is a copy of PAIRS Essentials.  Exhibit 30 is the copyright registration for that document.[2]  The effective date of the registration of this copyright "687"  is July 1, 2011, registered to PAIRS Foundation.  Doc. 14.

Plaintiff objected to the admission into evidence of these two documents.  Plaintiff argued that Defendants did not obtain a copyright for PAIRS Essentials until July 1, 2011, and therefore Plaintiff could not have infringed that copyright until that date.  Plaintiff argues that the court lacks subject matter jurisdiction of the claim with respect to the PAIRS Essentials copyright, citing Morgan v. Hanna Holdings, Inc., 635 F.Supp.2d 404, 409 (W.D. Pa. 2009).

With certain exceptions, a copyright must be registered before suing for copyright infringement.  Reed Elsevier, Inc. v. Muchnick, __ U.S. __,130 S.Ct. 1237, 1241, 176 L.Ed.2d 18 (2010), citing 17 U.S.C. § 411(a).  This is a precondition to suit, a claims processing condition, but it is not a condition affecting this court's subject matter jurisdiction.  Id.

There is no claims processing problem here.  Infringement of a copyright in PAIRS Essentials was alleged in the counter claim, filed on July 11, 2011, after the copyright had been registered.  Further, while the counter claim only alleges two earlier

---

[2] The copyright registration was also filed as document 14.

copyrights for the "original PAIRS materials" (from 1988 and 1989, "429" and "343," doc. 12, ¶ 12), it did allege violations of a copyright in PAIRS Essentials, as described above, specifically mentioned a copyright in PAIRS Essentials and attached a copy of PAIRS Essentials to the counter claim (*Id.*, ¶ 66 and Ex. B).  Although the counter claim explicitly sought a preliminary injunction to stop alleged infringement of the earlier copyrights, it also sought a preliminary injunction against alleged infringement of *any* of PAIRS's copyrights.  *Id.*, p. 19,  ¶¶ b and c.  Further, Defendants point out that they have a right to seek a preliminary injunction against future infringement of the PAIRS Essentials copyright.

In summary, I found the objection to be unpersuasive.  Exhibits 14 and 30 are in evidence.

**Findings of fact**[3]

**A short history of PAIRS and Live the Life**

Dr. Lori Gordon founded PAIRS.  Ex. 31 (transcript of the deposition of Dr. Gordon), p. 8.  She said that the ideas for PAIRS began in the late 1970's within a graduate course which she taught to graduate students in counseling at American University.  *Id.*  In 1983, her husband, Rabbi Morris Gordon, incorporated the venture as a nonprofit corporation, and it was named PAIRS, LTD.  *Id.*, p. 9.  Dr. Gordon testified that in the late 1970's, a manual and handbook (PAIRS Mastery Course) were

---

[3] The findings of fact which follow come from testimony and exhibits at the evidentiary hearing, as further explained without contradiction by affidavits of record. Robert Henthorn testified for PAIRS and Richard Albertson testified for Live the Life. Since there is no transcript of the hearing, there are no citations to the record of their testimony.  Dr. Gordon testified via a videotaped deposition, and doc. 31 is the transcript of that deposition, so her testimony is referenced by record citations.

"copyrighted with myself as the author." *Id.*  Another nonprofit 501(c)(3) corporation, PAIRS Foundation, Inc., was then incorporated so that the enterprise could received contributions.  *Id.*, p. 10.  She considered these two corporations to be the same entity. *Id.*

Dr. Gordon has a significant national reputation as a pioneer in marriage and relationship counseling, and PAIRS now has a training presence nationally and internationally.  Seth Eisenberg, Dr. Gordon's son, has been very active in the company, a member of the board, and has written some of the training materials with Dr. Gordon or by himself.

On March 24, 2004, Dr. Gordon established the Gordon Charitable Trust.  Ex. 31, p. 36 and Ex. 7.  She said that she did this because "licensed leaders" of PAIRS asked that ownership of the major curricula of PAIRS (not Dr. Gordon's books) be put into a trust that would pay Dr. Gordon 5% of the annual income of curricula sold in classes.  Ex. 31, p. 37.  She said that those leaders of PAIRS, including Don Adams, chairman of the board, had experienced "incidents" with her son, Seth Eisenberg, and "they wanted to be sure that he would not be in charge of this trust." *Id.*, p. 41.  The curricula listed in the trust document has an item entitled "Passage to Intimacy," the title to one of Dr. Gordon's books, but this is a two day workshop based upon information in the book; it is not a conveyance of the property right to the book itself.  Ex. 7, p. 18, and doc. 31, p. 40.

Plaintiff, Live the Life Ministries, Inc., was founded in 1999 by Richard Albertson, who is and has been the chief executive officer.  That non-profit corporation oversees a number of relationship training programs in Florida, primarily for Christian churches.  Ex.

31, p. 14.  Albertson wrote two relationship training programs, "Start Smart" for unmarried couples and "Adventures in Marriage" for married couples, and both are currently used by Live the Life Ministries.  Exhibits 16 and 17.  Albertson developed "Start Smart" at least as early as 1999 as a four hour program, and has operated "Start Smart" continuously since then.

### License agreements executed by Dr. Gordon and Live the Life

In about 2003, Albertson met Dr. Gordon at a conference in Miami.  Albertson became certified as an instructor in PAIRS Level I.  Ex. 31, p. 14.  Albertson testified that he then knew Dr. Gordon to be a pioneer in modern marriage and relationship counseling, the author and creator of many programs and writings, and the President and Chief Executive Officer of PAIRS Foundation, Inc., and PAIRS, Ltd.

Albertson said that in 2006, Live the Life Ministries was awarded a federal grant to provide marriage related training and classes.  In late 2007 or early 2008, Live the Life needed to expand "Start Smart" to 8 hours of training to satisfy the federal grant.  Albertson sought permission from various people to include their works in his expanded program.  Among those from whom he sought permission was Dr. Gordon.  He sought permission to use the "Daily Temperature Reading" and the "Dialogue Guide," concepts which appeared in Dr. Gordon's work and in PAIRS materials.

On June 26, 2009, Dr. Gordon executed a copyright license agreement with Live the Life.  Ex. 1.  Relevant here, she granted to Live the Life a non-exclusive right to copy and distribute "PAIRS Daily Temperature Reading" and "PAIRS Dialogue Guide." *Id.*, ¶ 1.  For the first year, Live the Life was to pay Dr. Gordon $5.00 for every couple that enrolled in Live the Life's online "Start Smart" course, and to pay $2.00 per couple

thereafter. *Id.*, ¶ 4.  The materials that were to be licensed are contained in Exhibit A to the license agreement.  Ex. 1, ¶ 2.  These are primarily text describing concepts and procedures.  There is no graphic accompanying "PAIRS Daily Temperature Reading." At the end, however, a graphic of the Dialogue Guide appears that is exactly the same as the one used in "Start Smart," which will be discussed ahead.  Compare Exhibit 1, ex. A, p. 9 to Exhibit 16, p. 32.  The graphic in the license agreement appears to be a copy from a card and identifies this as "PAIRS Dialogue Guide."  Ex. 1, ex. A, p. 9.

On November 17, 2009, Dr. Gordon granted to Live the Life a second license, replacing the one executed on June 26, 2009, and retroactive to that earlier date.  Ex. 4. The purpose was to more clearly describe the source of the matters licensed, that is, the "Daily Temperature Reading" and "Dialogue Guide."  The license stated that the materials were adapted from PASSAGE TO INTIMACY, and no longer referred to them as PAIRS material.  Ex. 4, ¶ 1.  Dr. Gordon wrote PASSAGE TO INTIMACY.  Ex. 31, p. 11. She personally held and still holds the copyright, dated 1993.  *Id.* and p. 12.  The same payment scheme, payable to Dr. Gordon personally, was contained in this license agreement, and the payments were limited to use in the Start Smart course.  Ex. 4, ¶ 4. The license agreement substituted copies of pages 59 and 84 from PASSAGE TO INTIMACY (Exhibit 24) as the sources of the "Daily Temperature Reading" and "The Dialogue Guide."  *Id.*, pp. 9-11.

On November 19, 2009, Dr. Gordon executed a third license agreement with Live the Life.  Ex. 6.  This license first states that Dr. Gordon owns the copyright to her book, PASSAGE TO INTIMACY, and to another book, LOVE KNOTS.  Ex. 6, ¶ 1. The license grants to Live the Life a non-exclusive right to create and copyright "derivative works" using Dr.

Gordon's books.  *Id.*, ¶ 2.  Live the Life and Dr. Gordon were to be considered joint owners of these derivative works, with Dr. Gordon having only a life estate in the works. *Id.*, ¶ 4.  Live the Life was to pay Dr. Gordon personally $5.00 for every couple that bought a copy of a derivative work, or $3.00 per person who bought the works.  *Id.*, ¶ 5. The derivative works were limited to two Live the Life programs, one of which was "Adventures in Marriage,"[4] and contained reference to the "Daily Temperature Reading" and the "Emotional Jug," but no graphics.  *Id.*, ¶ 2(b) and attached Exhibit "A."   Dr. Gordon said she believed she had authority to make this agreement because she personally held the copyrights to these books.  Ex. 31, p.36.

### The discord within PAIRS

From 2008 to April, 2011, Dr. Gordon and Eisenberg were in conflict as to the leadership of PAIRS, and a lawsuit ensued.  *Id.*, p. 42.  The purpose of the suit was to settle issues of management and control of PAIRS, and to enable Dr. Gordon to "clearly resign and to turn it over to Seth as the president, CEO, trainer.  It was my hope to do that."  *Id.*, p. 43.

Dr. Gordon testified that she was aware that her son, Seth Eisenberg, contended that she resigned her positions at PAIRS at a board meeting on June 11, 2008.  Ex. 31, pp. 26-27.  She testified that she did not resign her positions at that board meeting.  *Id.*, p. 27.  She contended that the lack of resignation was evidenced by an audio record. *Id.*, p. 29.  She testified that the audio record revealed that "Seth says, so, are you staying on the board, and I said yes.  I think I should, and he said okay."  *Id.*

---

[4] "Start Smart" is not mentioned.

Dr. Gordon said that the only two people present at the board meeting were herself and Seth Eisenberg.  *Id.*  She said that at a telephone board meeting in 2007, she informed the board that PAIRS had lost its insurance for directors and officers because "they had tried to get financial information from Seth who was project director of this five-year federal grant and who had information that I did not have."  *Id.*, p. 28.  The insurance was cancelled "when they could not get that information."  *Id.*  A number of board members resigned for lack of insurance.  *Id.*  Dr. Gordon said that from that date until April, 2011, her attorney and attorneys for Seth Eisenberg were in negotiation to settle their differences.  *Id.*

On April 12, 2011, a settlement was consummated.   Ex. 8.  The settlement was between Seth Eisenberg, The PAIRS Foundation, Inc., and PAIRS, Ltd. (hereafter "PAIRS"), and Dr. Gordon, The Gordon Irrevocable Trust, Ellen Purcell as Trustee of that Trust, and David Eisenberg (hereafter "Dr. Gordon").  Ex. 8.  The purpose was to settle all claims that might be between those parties.  *Id.*, p. 1.  There was no admission of liability.  *Id.*, ¶ 4.

Pursuant to this settlement, PAIRS agreed that Dr. Gordon, as president and founder of PAIRS, was the author of the curricula covered by the 1988 and 1989 copyrights "343" and "429," and "all subsequent adaptations, abbreviations, and derivative works," referred to as PAIRS IP (intellectual property), but Dr. Gordon agreed to take all necessary actions to cause the ownership and registration of those copyrights to be changed to PAIRS ownership as of 2004.[5]  *Id.*, ¶ 6.  Dr. Gordon would keep

---

[5] Dr. Gordon apparently had taken steps to change the ownership of those copyrights to her own name, and this settlement clause reversed that action.

royalties up to 2008.  *Id.*  PAIRS agreed that three books written by Dr. Gordon,

including PASSAGE TO INTIMACY, are Dr. Gordon's personal property.  *Id.*, ¶ 6.  Dr.

Gordon agreed that:

> her books do not in any manner impinge on PAIRS exclusive rights to
> determine the manner in which PAIRS IP is provided to the public beyond
> the personal benefit purchasers of her books receive for their own
> personal growth and development, that the books do not provide or
> suggest an alternative, substitute, or replacement for the requirements of
> PAIRS licensing agreements, and that PAIRS is exclusively authorized to
> determine the manner in which PAIRS IP is commercialized or presented
> to the public.  Through this agreement, Gordon agrees that only PAIRS
> may provide permission for any individual or entity to reprint or otherwise
> commercially exploit PAIRS IP included in her books for any purpose, that
> she will not allow her books to be used to authorize any person or entity to
> make commercial use of the materials and concepts included in PAIRS IP
> or as the basis to claim any right, title, or authority over PAIRS IP, without
> written permission of PAIRS.

*Id.*  In the paragraph entitled "transition," the parties agreed that Dr. Gordon "had no

financial responsibility and legal authority related to PAIRS as of June 11, 2008, . . . ."

*Id.*, ¶ 8.

Dr. Gordon testified that she did not believe that the settlement agreement was

"retroactive," "since I had signed the agreements with Richard Albertson in 2009," but

she had no problem with it "going forward."  Doc. 31, p. 46.  She said that she would

accept that "Seth Eisenberg became president in 2008."  *Id.*  She explained:  "So to me,

none of that was retroactive for what had been done.  It could be into the future."  *Id.*

She said that she thought that the settlement only prohibited Live the Life from certifying

people to teach, that certification to teach and licensing would henceforth go through

PAIRS.  *Id.*, p. 47.  But she said that she thought that the copyright licenses and waiver

she had previously given to Live the Life were still valid.  *Id.*, pp. 47-48.  She explained

that "until April 2011, I had not resigned as president of PAIRS Virginia or PAIRS Florida and considered that I was still on the board." *Id.*, p. 30.   She said that "[i]t was only at that time, April of 2011, that I gave up that I was an officer or president or director, even though in the settlement agreement I agreed that I would consider it as of 2008, which was the meeting you referred to," i.e., the meeting on June 11, 2008. *Id.*, pp. 28-29.

### The basis for the copy right claims at issue

The PAIRS Essentials document, Exhibit 14, which is the basis of the claims in this motion for preliminary injunction, was created by Dr. Gordon's son, Seth Eisenberg, in 2008.  Eisenberg is the current President and Chief Executive Officer of Defendants. The copyright for PAIRS Essentials is registered to The PAIRS Foundation, Inc.  Ex. 30.

PAIRS Essentials is based upon earlier works created by Dr. Gordon that are covered by copyrights "429" and "343," both of which were registered in 1988 and 1989, respectively, by The PAIRS Foundation, Inc.  Ex. 3.  It is also noted that the settlement agreement discussed above settled that those copyrights are owned by PAIRS.

The materials covered by the 1988 and 1989 copyrights were designed for a 120 hour course of training of professionals.  PAIRS Essentials extracted ideas from the earlier works, and was designed to be taught by lay instructors in a much shorter program, rather than for training professional counselors.  The pages of PAIRS Essentials at issue in this case are the following: "Levels of Learning," "Daily Temperature Reading," "PAIRS Talking Tips," and "The Emotional Jug."  Ex. 14, pp. 10, 21, 23, 33.[6]

---

[6] The page numbers are either in the lower left hand or right hand corners and are somewhat difficult to see.

PAIRS claims copyright infringement with respect to these four graphical depictions and the arrangement of text around the graphical images in PAIRS Essentials.  PAIRS does not claim a copyright in the substance of the text, that is, in the concepts themselves.  PAIRS agrees that the concepts have been in the public domain for years.  Live the Life's allegedly offending publications are "Start Smart" and "Adventures in Marriage."

### "Daily Temperature Reading"

"Start Smart" has a page entitled "Daily Temperature Reading."  Exhibit 16, p. 26. At the bottom of the page, Plaintiff represents that this page is used with permission of Dr. Gordon, founder of PAIRS and author of PASSAGE TO INTIMACY.  *Id.* "Adventures in Marriage" also contains the same "Daily Temperature Reading" graphic and text, but does not give attribution to anyone.  Ex. 17, p. 15.  The PAIRS version states at the top, "with appreciation to Virginia Satir."  Ex. 14, p. 21.  The graphical display (silhouettes of a female facing a male, reading left to right) is very similar to the graphic depicted in PAIRS Essentials.  The faces are slightly different, but the effect is the same.  The list of five concepts under this heading is identical in both graphics, except that one uses bullet points and the other uses numbers.[7]  Ex. 16, p. 26, compared to Ex. 14, p. 21. Both exhibits have additional text below the graphic, but the text is quite different and the Start Smart page leaves room for notes.  Ex. 16, p. 26.  On page 24 of PASSAGE TO INTIMACY contains the same five concepts, but a different graphic.  Ex. 24.  The graphic is a grid with a check mark.

-------------------

[7] The concepts or teaching topics are "appreciations, new information, puzzles, complaints with request for change, and wishes, hopes & dreams."

**"Dialogue Guide"**

"Start Smart" has a page entitled "Dialogue Guide."  Ex. 16, p. 32.  It is to be compared to "PAIRS Talking Tips" at page 23 of Exhibit 14, PAIRS Essentials.  The title is entirely different, and the text in the lower half of the page on both exhibits is entirely different.  The graphic is somewhat similar (a pie chart) with the northwest corner removed, and with the words "start here" printed in that space.  It is also similarly in that there is an arrow in about that position directing the eye to the right and clockwise around the "pie" graphic.  It is also similar in that many of the 10 concepts on the PAIRS version are found on the Live the Life version, but Live the Life has 18 concepts and has added "I suspect," "I believe," "I am puzzled by," "I am afraid of," "I behave by," and "I am happier when."  Ex. 14, p. 23, ex. 16, p. 32.  The Live the Life graphic of the "Dialogue Guide" is identical to the graphic in Dr. Gordon's book, PASSAGE TO INTIMACY, Ex. 24, page 84, which was also the same as contained in the license from Dr. Gordon dated November 17, 2009.  Ex. 4, p. 11.

**"Levels of Learning"**

"Adventures in Marriage" and PAIRS Essentials both contain a page entitled "Levels of Learning."  Ex. 17, p. 6; ex. 14, p. 10.  Both contain a graphic pyramid with four levels containing text.  The text at the four levels is identical.  The colors and fonts are different, and the pyramid in "Adventures in Marriage" is viewed straight on and from a slight elevation, displaying both the left and right sides of the pyramid at the same time, while the pyramid in PAIRS Essentials is rotated so that only the left side appears in perspective.  Both contain a section entitled "Notes," but the PAIRS

Essentials page contains text in the "Notes," while the "Notes" section in "Adventures in Marriage" leaves room for hand written notes.

### "The Emotional Jug"

"Adventures in Marriage" contains a page entitled "The Emotional Jug."  Ex. 17, p. 29.  So does PAIRS Essentials.  Ex. 14, p. 33.  The graphics of "jugs" are jars with a wide mouth and a wide cork.  In PAIRS Essentials, the jar is blue and is viewed straight on.  *Id.*  The broad cork is apparently rising and is askew to the right, with pink and blue bubbles rising from the space between the cork and the rim and from cross hatching on the sides of the jug, and the view is straight on.  *Id.*  The jar in "Adventures in Marriage" is purple, and the cork is in place, but black smoke is issuing from between the cork and the rim, and from cracks in the jar, and the view is slightly from above, rather than straight on.  Both pages contain exactly the same text surrounding the graphic of the jar, though the fonts, placement, and back ground color differs.  Both contain a "Notes" section, but like the "Levels of Learning" page, the "Notes" section in "Adventures in Marriage" has blank lines for note taking, while the "Notes" section in PAIRS Essentials has text.

### Legal analysis

To establish entitlement to a preliminary injunction, the moving party must establish: "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve

the public interest."  Grizzle v. Kemp, 634 F.3d 1314, 1320 (11th Cir. 2011) (citation omitted).

**Substantial likelihood of success**

A *prima facie* case of copyright infringement requires a showing that the claimant owns a valid copyright in the material and that defendants copied protected elements of the material.  Peter Letterese And Associates, Inc. v. World Institute Of Scientology Enterprises, 533 F.3d 1287, 1300 (11th Cir. 2008).

Defendants have proved ownership of the PAIRS Essentials copyright "687" by presenting a copy of the copyright registration, which established *prima facie* ownership of a valid copyright in the PAIRS Foundation.  Southern Bell Tel. and Tel. Co. v. Associated Telephone Directory Publishers, 756 F.2d 801, 811 (11th Cir. 1985).  All four of the graphical depictions at issue here are found in PAIRS Essentials.  Plaintiff has not rebutted this with any evidence.

"Copyright protects original expression only; it does not extend to any underlying ideas, procedures, processes, and systems."  Peter Letterese And Associates, Inc., 533 F.3d at 1302.  "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b).

> [Copyright] protection is available for the "association, presentation, and combination of the ideas and thought which go to make up the [author's] literary composition."  Or as we have recently stated, "What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals his facts, his choice of words and the emphasis he gives to particular developments."  The "ordinary" phrase may enjoy no protection as such, but its use in a

sequence of expressive words does not cause the entire passage to lose
protection.  And though the "ordinary" phrase may be quoted without fear
of infringement, a copier may not quote or paraphrase the sequence of
creative expression that includes such a phrase.

Peter Letterese And Associates, Inc., 533 F.3d at 1306, quoting Salinger v. Random

House, Inc., 811 F.2d 90, 92 (2d Cir. 1987).

Common geometric shapes and coloring alone do not qualify for copyright

protection.

This collection of common geometric shapes with a particular
photographic technique is not sufficiently original to qualify for copyright
protection.  *See Atari Games Corp. v. Oman*, 979 F.2d 242, 247 (D.C.
Cir.1992) ("We do not in any way question the Register's position that
'simple geometric shapes and coloring alone are per se not copyrightable.'
"); *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 545 (2d
Cir.1959) (circular, rectangular, and octagonal shapes not protected);
*William S. Geiger Corp. v. Gigi Accessories, Inc.*, No. 97 Civ. 5034(JSM),
1997 WL 458668, at *2 (S.D. N.Y. Aug.11, 1997) (plaintiff has no right to
copyright a geometric shape).

Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 35 (1st Cir.

2001).   Still, the court must examine the work for "total concept and feel."   Knitwaves,

Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1003 (2nd Cir. 1995).

As the Supreme Court's decision in *Feist Publications, Inc. v. Rural Tel.
Serv. Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), makes
clear, a work may be copyrightable even though it is entirely a compilation
of unprotectible elements.  *See id.* at 362, 111 S.Ct. at 1296 (even
telephone directory may be copyrightable if its listings are selected,
coordinated, or arranged in an original fashion).  What is protectible then
is "the author's original contributions," *id.* at 350, 111 S.Ct. at 1290—the
original way in which the author has "selected, coordinated, and arranged"
the elements of his or her work.  *Id.* at 358, 111 S.Ct. at 1294.

Id., at 1003-1004.  Thus, a combination of non-protectible common geometric shapes

and other common features may be sufficiently original to be appropriate for copyright

protection.  Titlecraft, Inc. v. National Football League, 2010 WL 5209293, 84 (D. Minn.

Dec 20, 2010) (No. CIV. 10-758 RHK/JJK) (involving the Vince Lombardi Trophy).  "To

put it another way, 'if it walks like a duck, quacks like a duck and looks like a duck, it has

got to be a duck' – or in this case a copy."  *Id.*

A further wrinkle in copyright law must also be noted.  When the idea merges

with the expression, leaving few choices for subject matter to express the idea, there is

no copyright protection.  *Id.*

> In *Concrete Machinery*, we explained the rationale behind the merger
> doctrine:
>
>> Some ideas admit of only a limited number of expressions.
>> When there is essentially only one way to express an idea,
>> the idea and its expression are inseparable and copyright is
>> no bar to copying that expression.  [Even] [w]hen the idea
>> and its expression are not completely inseparable, there may
>> still be only a limited number of ways of expressing the idea.
>
> 843 F.2d at 606 (internal citations omitted).  In such cases, the plaintiff has
> the heavy burden of showing "near identity" between the works at issue.
> *Id.* at 606–07 (*citing Sid & Marty Krofft Television v. McDonald's Corp.*,
> 562 F.2d 1157, 1167 (9th Cir. 1977), and *Flag Fables Inc. v. Jean Ann's
> Country Flags & Crafts, Inc.*, 730 F.Supp. 1165, 1171 (D. Mass.1990)).
> This heightened showing "is necessary because, as idea and expression
> merge, fewer and fewer aspects of a work embody a unique and creative
> expression of the idea; a copyright holder must then prove substantial
> similarity to those few aspects of the work that are expression not required
> by the idea."  *Id.* at 607 (*citing Universal Athletic Sales Co. v. Salkeld*, 511
> F.2d 904, 908 (3d Cir.1975)).
>
> In general, the merger doctrine is most applicable where the idea and the
> expression are of items found in nature, or are found commonly in
> everyday life. . . .

*Id.*, at 35-36.

Factual copying may be inferred, *inter alia*, through "proof of access to the

copyrighted work and probative similarity."  <u>Peter Letterese And Associates, Inc. v.

World Institute Of Scientology Enterprises</u>, 533 F.3d at 1300-1301, quoting <u>Bateman v.

Mnemonics, Inc., 79 F.3d 1532, 1541 (11th Cir.1996).  It is not disputed that Live the

Life had access to Defendants' copyrighted works.

   The issue to be decided, therefore, is probative similarity, that is, whether there is

substantial similarity between the allegedly offending materials and the original

elements of the copyrighted material.  Peter Letterese And Associates, Inc., 533 F.3d at

1301, quoting Bateman (quotation marks omitted).  "Probative similarity, in this sense,

exists where an average lay observer would recognize the alleged copy as having been

appropriated from the copyrighted work."  Id., at 1301 n.16, quoting Leigh v. Warner

Bros., Inc., 212 F.3d 1210, 1214 (11th Cir. 2000) (quoting Original Appalachian

Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 829 (11th Cir. 1982)).   A comparison of

the graphics demonstrates "probative similarity" sufficient to establish a *prima facie* case

of copying.

> Once copying has been proven, the issue is whether:
>
> such copying is "legally actionable; that is, whether there is 'substantial
> similarity' between the allegedly offending [works] and the protectable,
> original elements" of the book.  *See Bateman*, 79 F.3d at 1542[8]; *Oravec
> v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1224 n. 5 (11th Cir.
> 2008) (considering "whether a reasonable jury could find the competing
> [works] substantially similar at the level of protected expression"); *see also
> Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (noting
> that substantial similarity in this "second, more focused way" is necessary
> to establish that the defendant's attempt at appropriation "succeeded to a
> meaningful degree").

Peter Letterese And Associates, Inc., 533 F.3d at 1301.

   PAIRS has shown that there is "substantial similarity" as to the "Daily

Temperature Reading" in Start Smart and in Adventures in Marriage.  Compare Ex. 14,

---

   [8] Bateman v. Mnemonics, Inc., 79 F.3d 1532 (11th Cir. 1996).

p. 30, with Ex. 16, p. 26, and Ex. 17, p. 15.  The graphical display is somewhat different, in that the silhouettes are slightly different, but the overall effect is almost identical and has the same feel, and the arrangement of text between the silhouettes is identical. The merger doctrine is not operative here.  The idea to be conveyed is that couples should look at each either when talking to one another.  The silhouetted faces convey that idea.  But the idea could also be conveyed in a number of other ways.  For example, the graphic could show a couple standing and facing each other, or seated and facing each other, or walking and turned to face each other, and perhaps holding hands, and these graphics might be silhouettes or photographs or stylized cartoons. PAIRS's choice of silhouettes coupled with the arrangement of the concepts between the two silhouetted faces is original and appropriate for copyright protection.  The use of numbers instead of bullets does not save the Live the Life graphic from infringing the copyright in PAIRS Essentials.  Further, Live the Life's graphic did not exist in PASSAGE TO INTIMACY, so there cannot be any question of a valid license from Dr. Gordon.

PAIRS has not shown "substantial similarity" as to the "Dialogue Guide" in Start Smart.  Compare Ex. 14, p. 23, to Ex. 16, p. 32.  The title is different and the pie graphic used by Live the Life has more segments and more concepts.  Further, even if there were sufficient similarity, Dr. Gordon personally owns the copyright for this graphic in PASSAGE TO INTIMACY and she granted a license to Live the Life to use this graphic.  Ex. 4, p. 11 and Ex. 24, p. 84.

PAIRS has shown "substantial similarity" as to "Levels of Learning" as used by Live the Life in Adventures in Marriage.  Compare Ex. 14, p. 10, to Ex. 17, p. 6.  Even though the color is different, the graphic and arrangement of textual concepts has the

same feel.  A pyramid or a triangle is a geometric shape that cannot be copyrighted, but the connection between the textual concepts and the levels of the pyramid is unique. PAIRS Essentials explains that the idea depicted is that everyone begins with unconscious incompetence and the goal is to reach unconscious competence.  Ex. 14, p. 10.  The idea, therefore, is to depict a progression.[9]  It is common to depict a progression graphically, but there are a number of ways it can be done.  It could be shown as a measuring cup, with four levels marked, or by a silhouette of a brain, with four levels, or by a carnival graphic, with a figure swinging a mallet and trying to ring the bell at the top of four levels.  Since the idea to be expressed is not that one always has more unconscious incompetence than unconscious competence, a triangle, with diminishing returns at the apex, is not essential to express the idea.  But even if it were, there are other triangles: a staircase or ladder viewed from below with diminishing perspective, or a Frazier fir, or a musical triangle.  Thus, the merger doctrine does not prevent the material from enjoying a copyright.

PAIRS has shown "substantial similarity" as to "The Emotional Jug" as used by Live the Life in Adventures in Marriage, though this is a much closer call and perhaps should await a jury determination.[10]  Compare Ex. 14, p. 33, to Ex. 17, p. 29.  Life the

---

[9] The progression is not from unconsciousness to consciousness, as is often the case in psychology.

[10] "Historically, courts have hesitated to make determinations as to infringement or non-infringement on a summary judgment motion because of their 'reluctan[ce] to make subjective determinations regarding the similarity between two works.' " Peter Letterese And Associates, Inc., 533 F.3d at 1302.  Nonetheless, I recommend that the court grant the preliminary injunction as to "The Emotional Jug" because the two graphics with associated text, to me, are substantially the same and there are so many ways Live the Life could have depicted this idea without using a jar.

Life did not put textual concepts on the body of the jar, as found in PAIRS Essentials. Further, the color is different, the view is from a slightly different perspective, and the leaks are depicted differently.  But the arrangement of textual concepts around the jar is identical, the text is identical, and the overall concept of the graphic is functionally the same.  Live the Life could have graphically illustrated the same idea, enclosed emotions under pressure, with a graphic of a volcano, a tea kettle on a stove, a fizzing seltzer bottle, a cartoon bomb with a burning fuze, an angry sweaty face, a baseball player shouting at an umpire, an expanding balloon attached to an unattended air hose, or a overheated steaming radiator on a car.  Thus, the merger doctrine does not preclude copyright protection here.

Consequently, as a general matter PAIRS has shown copyright infringement with respect to the graphics and arrangement of text adjacent to the graphics with respect to the "Daily Temperature Reading," "The Emotional Jug," and "Levels of Learning."  Live the Life, however, contends that it has licenses to use these graphics.

"[T]he existence of actual consent negates the necessity of conducting a fair use analysis in the first place, as the existence of a license is an independent affirmative defense to a claim of copyright infringement."  Peter Letterese And Associates, Inc., 533 F.3d at 1308.  "While an exclusive license to use copyrighted material must be written, a nonexclusive license can be granted orally or can be implied from the conduct of the parties."  Korman v. HBC Florida, Inc., 182 F.3d 1291, 1293 (11th Cir. 1999), citing 17 U.S.C. § 204 and Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749, 751–52 (11th Cir. 1997).

Live the Life has not shown that Dr. Gordon granted a license to Live the Life to use the graphics and textual arrangement around the graphics in "Levels of Learning" and "The Emotional Jug."  Those graphics and textual arrangements are covered by the copyright for PAIRS Essentials, "687," owned by PAIRS.  Dr. Gordon has agreed that PAIRS owns this copyright.  Those graphics and the concepts were not mentioned in the first two licenses.  Exs. 1 and 4.  Those graphics did not appear in Dr. Gordon's work, Passage To Intimacy, and so could not have been granted in the last license, Exhibit 6.

Life the Life also has not shown that Dr. Gordon gave a license to use the "Daily Temperature Reading" graphic in Start Smart and in Adventures in Marriage.  The first license referred to this as the "PAIRS Daily Temperature Reading" and was limited to use in Start Smart.  Ex. 1.  The second, however, replaced that first license retroactively, but again, by the payment procedure, was limited to use in Start Smart.  Ex. 4.  Neither was a license to use the graphic in Adventures in Marriage.  Further, the replacement license explained that the source of the license was Dr. Gordon's book, Passage To Intimacy.  Ex. 4.  Passage To Intimacy, however, did not contain this graphic, although it did lists the textual concepts in the same order.  Ex. 24, p. 59.  PAIRS does not argue that the concepts listed for this topic are covered by their copyright.  Their claim is that the graphic and the arrangement of the concepts between the two silhouettes is protected, and that the protected material is covered by the PAIRS Essentials copyright.  It is undisputed that PAIRS owns that copyright.

In summary, none of the licenses executed by Dr. Gordon purported to grant a license to the graphic in PAIRS Essentials.  Consequently, there is no need to resolve

issues which the parties have presented as to whether Dr. Gordon had actual or apparent authority to act on behalf of PAIRS.  Even if Dr. Gordon had actual authority to license materials owned by PAIRS, the text of the licenses she executed did not convey rights to use the graphics in PAIRS Essentials.

Life the Life argues that the copying is not actionable because it was *de minimis*. The Eleventh Circuit has rejected the notion that a *de minimis* copying is not actionable. Peter Letterese And Associates, Inc., 533 F.3d at 1306-1307.  "The extent of copying must be assessed with respect to both the quantitative and the qualitative significance of the amount copied to the copyrighted work as a whole."  *Id.*, at 1307.  The three graphics at issue here at this point comprise three pages of PAIRS Essentials, which is a 67 page document.  Ex. 1.  While the number of pages from the PAIRS protected work is relatively small in comparison to the number of pages in the work as a whole, the quality of the graphics is significant and striking.  For that reason, the amount of copying shown here is actionable.

Thus, PAIRS has shown a substantial likelihood of success as to the claims of copyright infringement for Live the Life's use of the graphics and arrangement of text adjacent to the graphics with respect to the "Daily Temperature Reading," "The Emotional Jug," and "Levels of Learning" in Start Smart and Adventures in Marriage.

**Irreparable harm, the balance of harm, and the public interest**

It was formerly the rule in some circuits that a rebuttable presumption of irreparable harm arises when a plaintiff establishes a *prima facie* case of copyright infringement.  *E.g.*, Richard Feiner and Co., Inc. v. Turner Entertainment Co., 98 F.3d 33, 34 (2nd Cir. 1996).  The Second Circuit has altered that rule, however, in the wake

of eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641

(2006).[11]  Salinger v. Colting, 607 F.3d 68, 77 and n. 6, 77-83 (2nd Cir. 2010) (citing,

inter alia, Peter Letterese And Associates, Inc.).  In Peter Letterese And Associates,

Inc., the court noted that a permanent injunction "does not automatically issue upon a

finding of copyright infringement," citing eBay, and held that a plaintiff must still

demonstrate the four requisites for either a preliminary or a permanent injunction.  533

F.3d at 1323.

> The Second Circuit in the Salinger case concluded:

> Second, the court may issue the injunction only if the plaintiff has
> demonstrated "that he is likely to suffer irreparable injury in the absence of
> an injunction."  Winter, 129 S.Ct. at 374.[[12]]  The court must not adopt a
> "categorical" or "general" rule or presume that the plaintiff will suffer
> irreparable harm (unless such a "departure from the long tradition of equity
> practice" was intended by Congress).  eBay, 547 U.S. at 391, 393-94, 126
> S.Ct. 1837.  Instead, the court must actually consider the injury the plaintiff
> will suffer if he or she loses on the preliminary injunction but ultimately
> prevails on the merits, paying particular attention to whether the "remedies
> available at law, such as monetary damages, are inadequate to
> compensate for that injury."  eBay, 547 U.S. at 391, 126 S.Ct. 1837; see
> also Winter, 129 S.Ct. at 375 (quoting 11A Charles Alan Wright, Arthur R.
> Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d
> ed.1995), for the proposition that an applicant for a preliminary injunction
> "must demonstrate that in the absence of a preliminary injunction, 'the
> applicant is likely to suffer irreparable harm before a decision on the merits
> can be rendered' ").

Salinger v. Colting, 607 F.3d at 80.

> The Second Circuit reasoned that the court must consider the balance of harm,

and whether damages may recompense the claimant.  607 F.3d at 81.

---

[11] eBay was a patent case.

[12] Winter v. Natural Resources Defense Council, __ U.S. __, 129 S.Ct. 365, 172
L.Ed.2d 249 (2008).

> Harm might be irremediable, or irreparable, for many reasons, including
> that a loss is difficult to replace or difficult to measure, or that it is a loss
> that one should not be expected to suffer.  In the context of copyright
> infringement cases, the harm to the plaintiff's property interest has often
> been characterized as irreparable in light of possible market confusion.

*Id.*, at 81.

> After eBay, however, courts must not simply presume irreparable harm.
> *See eBay*, 547 U.S. at 393, 126 S.Ct. 1837.  Rather, plaintiffs must show
> that, on the facts of their case, the failure to issue an injunction would
> actually cause irreparable harm.  This is not to say that most copyright
> plaintiffs who have shown a likelihood of success on the merits would not
> be irreparably harmed absent preliminary injunctive relief.  As an empirical
> matter, that may well be the case, and the historical tendency to issue
> preliminary injunctions readily in copyright cases may reflect just that.

*Id.*, at 82.

In other words, the final three factors to be considered before issuing a

preliminary injunction are significantly related.  In the case at bar, Live the Life has had

a significant relationship over a number of years with PAIRS and Dr. Gordon.  Albertson

was certified as a PAIRS trainer, and Live the Life has used PAIRS material with

permission on past occasions.

However, PAIRS has shown a substantial likelihood that Live the Life is infringing

its copyrights in the graphics and arrangements of the "Daily Temperature Reading,"

"Levels of Learning," and "The Emotional Jug."  The use of those graphics in

Adventures in Marriage gives credit to Dr. Gordon (representing that the program is the

joint work of Dr. Gordon and Live the Life), but it gives no credit to PAIRS and does not

acknowledge the copyright that PAIRS has in PAIRS Essentials.

The use of the "Daily Temperature Reading" in Start Smart again gives credit to

Dr. Gordon, but gives no credit to PAIRS and does not acknowledge the copyright that

PAIRS has in PAIRS Essentials.  Live the Life and PAIRS provide the same kind of relationship training, and the continued use of these graphics by Live the Life will create confusion.

While the confusion was, in part, due to the inner turmoil at PAIRS, the April, 2011, settlement has ended that turmoil and PAIRS is entitled to go forward without such confusion in the future.  Pursuant to the settlement agreement, Dr. Gordon has agreed that all of the relevant copyrights, except for her books, are owned by PAIRS, and the graphics at issue here were not in Dr. Gordon's books.  A preliminary injunction will serve the purpose of allowing PAIRS to go forward without brand confusion with Live the Life.

On the whole, therefore, PAIRS has shown that it will be irreparably harmed if a preliminary injunction does not issue, and it has shown that its harm outweighs harm that Live the Life will suffer.  Finally, PAIRS has shown that a preliminary injunction will not harm the public interest.  The public has an interest in the avoidance of confusion in this market and in copyright protection.

**Security**

The court must require PAIRS to give security.  "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  Plaintiff has asked that a security bond be posted, but has not suggested an amount.  In the absence of further argument, it is recommended that a security bond of $25,000.00 be posted.

Accordingly, it is **RECOMMENDED** that the court **GRANT** Defendants' motion for a preliminary injunction, doc. 17, and **ENJOIN** Plaintiff from using the graphics and text arrangements of "Daily Temperature Reading" in Start Smart and in Adventures in Marriage, and from using "Levels of Learning" and "The Emotional Jug" in Adventures in Marriage, and to **ORDER** that the preliminary injunction not take effect until Defendants have posted $25,000.00 as security.

**IN CHAMBERS** at Tallahassee, Florida, on September 27, 2011.


s/____William C. Sherrill, Jr._____
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**